# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| KATHERINE J. MERA,<br><br>    Plaintiff,<br><br>  v.<br><br>MERRICK GARLAND,<br><br>    Defendant. | Civil Action No. 20-2127 (BAH)<br><br>Judge Beryl A. Howell |

## MEMORANDUM OPINION

Plaintiff Katherine Mera, a former employee at the Department of Justice's ("DOJ")

Office of Violence Against Women ("OVW"), filed this action against the Attorney General of

the United States, alleging, race, national origin, and disability discrimination (Count I) and

retaliation (Count II), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*,

and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*; and a "mixed case appeal" (Count

III), under the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. § 1101 *et seq.*[1]  Following

an ample period of discovery and jointly requested stay during the global COVID-19 pandemic,

defendant has moved for summary judgment on plaintiff's remaining claims of disability

discrimination, retaliation, and a mixed case appeal.  *See* Def.'s Mot. Summ. J. ("Def.'s Mot."),

ECF No. 27; Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem."), ECF No. 27-1; Pl.'s Opp'n

Def.'s Mot. Summ. J. ("Pl.'s Opp'n") at 3 n.2, ECF No. 30 ("Plaintiff has decided to withdraw

her claims of race and national origin discrimination."); Def.'s Reply Supp. Mot. Summ. J.

("Def.'s Reply"), ECF No. 33.  For the reasons set forth below, defendant's motion is granted.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Merrick Garland, as the current Attorney General of the United States, has been substituted as a party.

# I.    BACKGROUND

The factual background and procedural history of the instant matter are summarized below.

## A.    Factual Background

Plaintiff joined DOJ in 1997 and OVW in 2001, where she worked until her removal on March 25, 2020.[2]  Pl.'s Statement of Genuine Issues ("Pl.'s SOF") ¶ 1, ECF No. 30-1.[3]  For much of her time at OVW, she worked as a GS-13 Grant Program Specialist in OVW's Campus Unit, and at all relevant times, her first-level supervisor was Associate Director Darlene Johnson, and her second-level supervisor was Deputy Director for Grant Development and Management Nadine Neufville.  *Id.* ¶¶ 2–4; *see also* Def.'s 1st App'x at 7–9 (Ex. 1: Mera Aff.), ECF No. 27-3.[4]  Since December 2017, plaintiff has been rated 100% disabled by the Department of Veterans Affairs.  Pl.'s SOF ¶ 5.

### 1.    *Plaintiff's Credit Card Misuse and 2016–2017 Final Appraisal*

In July 2017, plaintiff failed to pay the balance on her government-issued credit card.  *Id.* ¶ 8.[5]  A subsequent audit of her account revealed that since 2008, plaintiff had used her credit

---

[2]    According to plaintiff's opposition, she joined DOJ in 1998, *see* Pl.'s Opp'n at 5, but her statement of facts states that she joined in 1997, *see* Pl.'s Statement of Genuine Issues ("Pl.'s SOF") ¶ 1, ECF No. 30-1.

[3]    Since plaintiff's statement of facts incorporates defendant's statement of facts and, on a motion for summary judgment, all justifiable inferences must be drawn in favor of plaintiff as the nonmovant, for simplicity, only plaintiff's statement of facts will be cited for facts on which the parties agree.  Any relevant factual disagreements are expressly noted.

[4]    The pagination in defendant's exhibits is not legible; consequently, references to defense exhibits reflect the pagination generated automatically by the Court's Case Management/Electronic Case Filing ("CM/ECF") system.  A brief description of the exhibit, where relevant, is provided in parenthetical.

[5]    Plaintiff concedes that she misused her government credit card, for which misconduct a suspension was appropriate, but she nonetheless objects to the admission of all evidence related to her credit card misuse as not relevant.  *See* Pl.'s SOF ¶¶ 8–22.  Plaintiff's objection is overruled.  Relevance under Rule 401 is a low bar, merely requiring that evidence have "any tendency to make a fact more or less probable than it would be without the evidence," and "the fact" to be "of consequence in determining the action."  Fed. R. Evid. 401.  Here, plaintiff argues that defendant's retaliatory motive can be inferred from, *inter alia*, defendant's delayed issuance of plaintiff's 2017–2018 midterm review and final appraisal.  *See* Pl.'s Opp'n at 33.  Yet, defendant offers a legitimate,

card to make at least 141 unauthorized personal transactions, including for food, hotels, and numerous cash advances, totaling at least $19,329.57 in unauthorized charges, despite clear instruction that her travel card was to be used for only official expenses.  *Id.* ¶¶ 9–10.

On April 23, 2018, Johnson proposed a 14-day suspension.  *Id.* ¶ 16; *see also* Def.'s 2d App'x at 57–68 (Ex. 13: Proposed 14-Day Suspension), ECF No. 27-4.  Rather than dispute whether the identified charges were improper, *see* Pl.'s SOF ¶ 17, plaintiff argued that the charges had been a mistake and that the proposed suspension was "a form of retaliation" against her, *id.* ¶ 18 (citation omitted); *see also* Def.'s 2d App'x at 69–74 (Exs. 14 & 15: Plaintiff's Response & Accompanying Declaration).

In early May 2018, Johnson and Neufville signed off on plaintiff's 2016–2017 final appraisal, which rated plaintiff "Successful" overall and for each of the three critical elements on which an employee is rated.  *See* Pl.'s SOF ¶¶ 7, 29–30; *see also* Def.'s 2d App'x at 42–56 (Ex. 12: 2016–2017 Final Appraisal).[6]  This final appraisal, however, was delayed by seven months.[7]  According to defendant, OVW's Human Resources advised Johnson not to issue plaintiff's final appraisal until a punishment for plaintiff's credit card misuse was proposed, so as "to avoid conflating the separate matters of [plaintiff's] conduct and performance."  Def.'s Statement of

---

nondiscriminatory reason for this delay, explaining that plaintiff's review cycle had been set off by seven months due to plaintiff's credit card misuse.  Def.'s Statement of Material Facts ("Def.'s SOF") ¶ 28, ECF No. 27-2.  That plaintiff does not believe this explanation, *see* Pl.'s SOF ¶ 28, does not undercut the relevance of this evidence because if a jury were to find defendant's explanation credible, this would tend to make defendant's proffered nondiscriminatory reason more probable than it would be without the evidence.

[6]    The four possible ratings are "Unacceptable," "Successful," "Excellent," and "Outstanding," and the three critical elements are "Communication and Customer Service," "Accountability for Organizational Results," and "Fiscal Responsibility/Taxpayer Value."  *See* Def.'s 2d App'x at 43.

[7]    Defendant contends that no official DOJ policy required that appraisals be due on a specific date, *see* Def.'s SOF ¶ 33, but defendant's employees acknowledged that a "rating period" existed, *see, e.g.*, Def.'s 3d App'x at 27 (Ex. 21: Johnson Aff.), ECF No. 27-5.  Plaintiff explains that the CBA provides that the "rating official shall complete the Rating of Record within 30 days of the end of the appraisal cycle," Pl.'s Opp'n at 13 (citation omitted), and "only allows the time for the submission" of a final appraisal "to be extended where a rating of record cannot be prepared at the time specified," Pl.'s SOF ¶ 33 (citation omitted).

Material Facts ("Def.'s SOF") ¶ 28, ECF No. 27-2; *see also* Def.'s 3d App'x at 91–93 (Ex. 24: Johnson's Email re: Timing of Final Appraisal), ECF No. 27-5.  Plaintiff disputes the believability of this explanation.  *See* Pl.'s SOF ¶ 28; *see also supra* note 5.

On May 29, 2018, Neufville, upon finding noncredible plaintiff's claim that the improper charges were mistakes, imposed a ten-day suspension.  Pl.'s SOF ¶¶ 19–20; *see also* Def.'s 2d App'x at 75–98 (Ex. 16: Decision on Proposed 14-Day Suspension).[8]

## 2. *Settlement of Plaintiff's 2018 EEO Complaint*

Plaintiff filed her first Equal Employment Opportunity ("EEO") complaint in February 2018 ("2018 EEO Complaint"), alleging disability discrimination and retaliation, *see* Pl.'s Ex. 10, ECF No. 30-11, though these specific allegations are not at issue in this case.  The parties settled the 2018 EEO Complaint in June 2018 after mediation, when OVW agreed, *inter alia*, to reduce plaintiff's suspension due to her credit card misuse from ten to five days and to provide her certain reasonable accommodations.  *See* Def.'s 2d App'x at 99–103 (Ex. 17: Settlement Agreement); Pl.'s Ex. 14, ECF No. 30-15 (same); *see also* Pl.'s SOF ¶ 24.

Defendant provided plaintiff with an accommodation record dated July 2018 to "memorialize" the parties' agreed-upon accommodations.  Def.'s SOF ¶¶ 24–25; *see also* Def.'s 2d App'x at 108–10 (Ex. 19: July 2018 Accommodation Record).  When plaintiff challenged this record for failing to reflect, fully and accurately, the terms to which the parties had agreed during mediation, *see* Def.'s 2d App'x at 104–07 (Ex. 18: Pl.'s Email Challenging Record); Pl.'s Ex. 17, ECF No. 30-18 (same), the parties revised and executed a final accommodation record dated

---

[8]     Plaintiff asserts that "a jury could infer that Ms. Neufville was motivated to retaliate against [plaintiff] because she resented the fact that the 10-day punishment was reduced to five days in the Settlement of Ms. Mera's EEO complaint," Pl.'s SOF ¶ 20, but this assertion is without foundation since Neufville's findings about plaintiff's credibility occurred before the settlement of plaintiff's EEO complaint, *id.* ¶ 23.

October 2018, *see* Def.'s 2d App'x at 111–13 (Ex. 20: Oct. 2018 Accommodation Record).  *See*
Pl.'s SOF ¶¶ 26–27.

### 3.  *Alleged Hostile Conduct After Settlement of 2018 EEO Complaint*

While, as noted, the specific allegations in plaintiff's 2018 EEO Complaint are not at
issue in this matter, plaintiff contends that after the settlement of that complaint, Johnson and
Neufville "engaged in a series [of] oppressive, harassing[,] and abusive conduct" that amounted
to the hostile work environment claimed in this lawsuit.  Pl.'s Opp'n at 11.  Plaintiff's allegations
are described below in roughly chronological order.

#### a)  *Attempts to Secure New Positions (Sept. 2018–Feb. 2019)*

Between September 2018 and February 2019, plaintiff repeatedly but unsuccessfully
attempted to secure four different new positions within OVW, though none of the positions
plaintiff sought offered greater pay, benefits, or promotional opportunities.  Pl.'s SOF ¶ 65.

First, on September 13, 2018, an office-wide email announced that OVW's Tribal Affairs
and Grant Development and Management Divisions were accepting requests for "internal lateral
reassignments."  Def.'s 3d App'x at 187 (Ex. 36: Office-Wide Email).  Plaintiff indicated interest
in the opportunity but was ultimately denied a transfer.  Pl.'s SOF ¶¶ 67–68.  According to
defendant, the opportunity was created for employees "to swap positions," which necessarily
requires two or more employees, and thus when plaintiff was the only employee to indicate
interest in changing positions, OVW abandoned the idea of offering internal lateral reassignment
completely.  Def.'s SOF ¶¶ 66–68; *see also* Def.'s 3d App'x at 213 (Ex. 41: Pl.'s Email re:
Transfer Opportunities) (plaintiff acknowledging that she "was the only staff member to
respond" to the internal lateral reassignment email).  Plaintiff disputes "the motives" behind the
denial of her transfer.  Pl.'s SOF ¶ 68.

Second, on November 8, 2018, plaintiff expressed interest in temporarily assisting OVW's Tribal Unit.  *Id.* ¶ 69; *see also* Def.'s 3d App'x at 207–09 (Ex. 39: Pl.'s Email re: Tribal Unit).  At plaintiff's request, Neufville asked Sherianne Moore, the head of the Tribal Unit, to accept plaintiff, but Moore refused.  Pl.'s SOF ¶¶ 70–71.  According to OVW policy, a supervisor is permitted to veto any decision to add an employee to her unit, and thus Moore, who was not in Neufville's chain of command, could not be forced to accept plaintiff.  *Id.* ¶¶ 71, 75.  In a subsequent conversation in February 2019, Neufville allegedly told plaintiff that she was denied a transfer "based on personality," Def.'s 1st App'x at 27 (Ex. 1: Mera Aff.), not because of her disability or any prior EEO activity.

Third, on November 27 and December 11, 2018, plaintiff again indicated interest in transferring positions.  Pl.'s SOF ¶ 72; *see also* Def.'s 3d App'x at 218–19 (Ex. 43: Neufville's Email to Sullivan).  Neufville told plaintiff that the only open position was in the Services, Training, Officers, Prosecutors ("STOP") Unit and asked Amy Loder, the head of the STOP Unit, whether she might accept plaintiff.  Pl.'s SOF ¶¶ 73–74.  According to Neufville, Loder put "her hands in the prayer position and begged Neufville not to force her to take [plaintiff]," saying "please, please, please don't give [plaintiff] to me."  *Id.* ¶ 75 (alterations in original accepted and citation omitted); *see also* Def.'s 1st App'x at 73 (Ex. 4: Neufville Dep.) ("I have a clear recollection of Ms. Loder coming to me with her hands in the prayer position and begging me not to force her to take Ms. Mera."); *see also* Def.'s 3d App'x at 211 (Ex. 40: Neufville's Notes from Meeting with Plaintiff) (explaining that Loder had "the only open position at this time" and "reaffirmed her lack of interest in having [plaintiff] move to her unit"), 217 (Ex. 42: Pl.'s Email re: STOP Unit) (plaintiff acknowledging that "the decision was made based on the prerogative of the [head] of the STOP Unit, Amy Loder" to "decline[] [plaintiff's] transfer").

6

Fourth, Neufville told plaintiff that she hoped to secure approval for a new position reporting directly to her that plaintiff could potentially take.  Pl.'s SOF ¶ 76.  This idea, however, was rejected by OVW's Acting Director Katharine Sullivan, which decision was relayed back to plaintiff.  *Id.* ¶¶ 77–78; *see also* Def.'s 3d App'x at 215 (Ex. 41: Pl.'s Email re: Transfer Opportunities) (plaintiff acknowledging that Neufville could not secure approval for a new position), 219 (Ex. 43: Neufville's Email to Sullivan).

### b)  *Feedback from Latinisha Lewis (Oct. 2018)*

On October 12, 2018, Latinisha Lewis, who was reviewing plaintiff's Grant Adjustment Notices, sent plaintiff an email stating: "I have been reviewing a few of your [Notices] and have noticed that you have asked grantees to submit letters for their requests with the [grantee authorized representative's] signatures attached. . . .  This is an unnecessary step for grantees since they are authorized points of contact for the grant, but more importantly, this is not a campus program requirement for submission of [Notice] requests outside of signing official [Notices].  Not sure if this is something new, just noticed this."  Def.'s 3d App'x at 105 (Ex. 26: Emails re: Notices); *see also* Pl.'s SOF ¶¶ 34, 37.  Defendant explains that requiring signatures from a grantee's authorized representative, usually a high-ranking university official, inconveniences grantees and slows down the grant process since Notices often involve routine actions that lower-level administrators can handle.  Def.'s SOF ¶ 35.

Plaintiff responded, "I understand you are a non-supervisory team lead but, if there are any concerns please forward such to my supervisor Darlene Johnson," and Lewis, in turn, said, "I understand my role and responsibilities, but not a problem.  I am sure Darlene will weigh in when she returns Monday."  Def.'s 3d App'x at 104 (Ex. 26: Emails re: Notices); Pl.'s SOF ¶¶ 37, 39.  At the same time, plaintiff concedes that she did not know if making such requests for

signatures of a grantee's authorized representative was standard practice but alleges that she had made them in the past without criticism. Pl.'s SOF ¶¶ 35–36. Plaintiff forwarded her exchange with Lewis to Johnson, writing: "I am very concerned about this email. I request the micro-management or attempt to micro-manage to stop." Johnson replied: "[L]et's discuss because Latinisha has been reviewing [Notices] for some time now—this is one of her responsibilities as a team lead. I'm not for sure I understand your concerns here. Based on the email traffic below—Latinisha was only raising this because [it's] not a program or unit practice to ask for a letter from the [authorized representative]. If there are some [] extenuat[ing] circumstances that warrants a letter please let me know. Thanks for [bringing] this to my attention." Def.'s 3d App'x at 104; Pl.'s SOF ¶¶ 40–41. Johnson nonetheless removed Lewis from reviewing plaintiff's work and advised her to "change her approach" and "soften up." Pl.'s SOF ¶ 42 (alteration in original accepted and citation omitted).[9]

### c) Plaintiff's 2017–2018 Midterm Review (Nov. 2018)

Plaintiff's 2017–2018 midterm review occurred in November 2018, several months later than expected. *Id.* ¶¶ 44–45.[10] As part of the review, Johnson told plaintiff that her work had deteriorated in quality, that she was failing to follow up on tasks or communicate with grantees, and that she was otherwise failing to "meet[] the work elements that were critical to [her] job." Def.'s SOF ¶ 46. Johnson described this conversation as a "normal supervisory exchange with

---

[9]      Plaintiff argues that Johnson "fail[ed] to respond to her October 12, 2018 request to end the micro-management of her work by Team Lead Latinisha Lewis," Pl.'s Opp'n at 11, but this conclusory statement is contradicted by the factual record, *see, e.g.*, Def.'s 1st App'x at 51–52 (Ex. 2: Mera Dep.) (acknowledging that Johnson removed Lewis as plaintiff's first-line reviewer), and plaintiff's statement of facts, *see* Pl.'s SOF ¶¶ 41–42 (admitting that Johnson replied to plaintiff's email complaining about micromanaging, and disputing the statement that Johnson "removed Lewis as [plaintiff's] first-line reviewer," and "advised her to 'change her approach' and 'soften up,'" only insofar as Lewis is described as plaintiff's "first-line reviewer").

[10]      Defendant contends that plaintiff's midterm review occurred on November 20, 2018, *see* Def.'s SOF ¶ 45, whereas plaintiff inconsistently lists the date of her midterm review as both November 15, 2018, *see* Pl.'s Opp'n at 13; Pl.'s SOF ¶ 45, and November 20, 2018, *see* Pl.'s Opp'n at 11.

an employee," Def.'s 3d App'x at 14 (Ex. 21: Johnson Aff.), but defendant contends that the criticism was "undu[e]," Pl.'s SOF ¶ 46.[11]

Johnson contends that she then "went through a snapshot of [plaintiff's] work up until that time," advising plaintiff how to "end the performance period . . . on a high note" and "get back on track."  Def.'s SOF ¶ 47.  Plaintiff again contests this characterization, arguing that Johnson's feedback was "vague" and "general," and Johnson stated that she "did not have that documentation" when asked, by plaintiff, to point to specific cases where plaintiff had "fell short."  Pl.'s SOF ¶¶ 46–47.

        *d)*        *Questioning of Plaintiff's Division Meeting Attendance (Jan. 2019)*

On January 31, 2019, plaintiff attended a division meeting by phone, and when Neufville asked her a question, plaintiff did not respond, though plaintiff "has no recollection of the conversation."  *Id.* ¶ 53.  Another employee later told Neufville that plaintiff had left the call to speak with a grantee.  *Id.* ¶ 54.  Neufville emailed plaintiff to ask if she had been on the call, to which plaintiff responded: "Yes.  Is there something I can help you with?"  *Id.* ¶¶ 55–56.  When Neufville wrote back, "I didn't believe that you were on the phone call," plaintiff said, "Yes, I was.  I've been on the phone call the whole time" and sent Neufville a screenshot of her phone screen.  *Id.* ¶¶ 57–58.

        *e)*        *Johnson's Frustrations During Unit Meeting (Jan. 2019)*

On January 31, 2019, plaintiff attended a unit meeting by phone, during which Johnson, who was upset that a grantee had elevated an issue to Sullivan, allegedly said: "This is your grantee.  You should be dealing with this.  I don't want s*** to happen outside of the unit.  I

---

[11]    The purpose of a midterm review is "to alert the employee of their performance including any noted deficiencies to allow the employee time to make improvements before a final performance rating is issued," and so no formal documentation of a midterm review's substance is made.  *See* Def.'s 3d App'x at 106–08 (Ex. 27: Email re: Midterm Review).

don't want the [Acting] Director to deal with these types of issues.  I don't want us to stick out.
This incident is just a damn mess, and, we don't need the f****** attention." *Id.* ¶¶ 59–60.
Plaintiff filed a complaint with the Office of Inspector General ("OIG") based on these
comments. *Id.* ¶ 60; *see also* Def.'s 3d App'x at 112–15 (Ex. 29: OIG Compl.).  Although
plaintiff argues, in her opposition, that Johnson was "singling her out for verbal criticism,
directing profanity toward her, and generally attempting to bully her," Pl.'s Opp'n at 12, her OIG
complaint claims that Johnson was "shouting and cussing at the Unit staff" and continued to do
so even after plaintiff "excused [her]self from the call," Def.'s 3d App'x at 115.

Upon receipt of plaintiff's complaint, Neufville spoke to Johnson and all the other
employees who were present at the meeting about the incident.  Pl.'s SOF ¶ 62.  The other
employees confirmed that Johnson yelled but none thought Johnson had singled plaintiff out.  *Id.*
¶¶ 62–63.  Neufville attended Johnson's next unit meeting.  *Id.* ¶ 64.

*f)*     *Plaintiff's Availability During Work Hours (Mar.–Apr. 2019)*

Per office policy, teleworking employees are required to respond to emails within two
hours or let their supervisors know about their unavailability for longer periods of time.  *Id.* ¶ 79.
Beginning in early March 2019, Johnson noticed that plaintiff was often unresponsive during
normal work hours and responded to messages only in the late afternoon or evenings, slowing
down the unit's work.  *Id.* ¶ 80.  Although plaintiff does not dispute that she frequently worked
late to catch up on her assignments, she disputes that she was unresponsive during the day.  *Id.*
¶¶ 80–81.

On April 4, 2019, Johnson asked plaintiff whether she was, in fact, working.  *Id.* ¶ 82.
When plaintiff said that she was, Johnson accepted plaintiff's answer and noted: "I'm used to
you responding within minutes and, and not hours."  *Id.* ¶¶ 83–84.  Johnson then attempted to

10

move on with the conversation, but plaintiff asked, "What are you accusing me of?"  *Id.* ¶ 84.

When Johnson repeated that she was satisfied with plaintiff's answer, plaintiff nonetheless

continued to ask Johnson what she was accusing her of.  *Id.* ¶ 85.

At 8:13 p.m. on April 17, 2019, plaintiff sent Neufville an email about transferring roles.

*Id.* ¶ 87.  When Neufville reminded plaintiff that she had been instructed "several times not to

send emails after hours," plaintiff requested "the written order and policy regarding the sending

of work emails."  *Id.* ¶¶ 88–89.[12]  Neufville, in response, explained that "there are reasonable

directions that any of us can receive from our supervisor and/or office leadership which we must

follow," and that "[i]t is reasonable for you to be asked to restrict your emails, unless urgent, to

normal business hours."  *Id.* ¶ 90.  She further noted that "[i]n this technologically driven age, it

gets more and more difficult to draw the line between work time and personal time," which is

why "we need staff and managers to be available and responsive via email, Skype, and telephone

during normal business hours and to conduct business during those hours," and that "[b]eing

available and conducting business during business hours also shows respect for the personal lives

and personal time of our colleagues and grantees.  When emails come in and ping after hours, we

do not know if they are urgent or not until we read them; and by that time, it's too late—personal

time has already been interrupted."  *Id.* ¶ 91.

Plaintiff forwarded Neufville's email to the EEO office, claiming that she was "being

singled out" for "retaliation," since she had sent emails after hours to coworkers in the past but

was "not chided for doing so" until she filed her 2018 EEO Complaint.  *Id.* ¶ 93.  Later, plaintiff

responded to Neufville's email and asked to speak to Sullivan's superior, the Attorney General.

*Id.* ¶¶ 94–95.  At 8:51 p.m., plaintiff forwarded her emails with Neufville to the Deputy Attorney

---

[12]     Several months earlier, in December 2018, plaintiff had been asked by Sullivan, after sending an email at 8:52 p.m., to "refrain from sending business emails after normal work hours."  Def.'s 3d App'x at 214–15; Pl.'s SOF ¶ 81.

General, Rod Rosenstein, requesting "an appointment to meet with you to discuss the email chain below."  *Id.* ¶ 96.

g)      *Plaintiff's 2017–2018 Final Appraisal (May 2019)*

In May 2019, Johnson and Neufville signed plaintiff's 2017–2018 final appraisal, in which plaintiff was rated "Unacceptable" overall and across all three critical elements.  *Id.* ¶¶ 97–99; *see also* Def.'s 3d App'x at 235–48 (Ex. 48: 2017–2018 Final Appraisal).  Critically, the final appraisal explained precisely why plaintiff failed to achieve a "Successful" rating in any of the three categories.

First, with respect to "Communication and Customer Service," the appraisal explained that "in order to achieve a Successful rating in the future," plaintiff must "decrease the level of guidance she needs to respond to routine inquiries" and demonstrate better judgment when determining whether "to involve her supervisor and/or other OVW leadership in emails in responding to inquiries from her grantees," especially given that she is "a veteran GS-13 program specialist in OVW for more than 10 years, more than 5 of those spent working on the Campus Program."  Def.'s 3d App'x at 237.  Plaintiff also needed to better "demonstrate sound judgment in responding to grantees," "demonstrate a higher level of expertise in program policy and grant program administration processes," and "maintain her responsiveness to internal and external inquiries while working, including teleworking."  *Id.*

Second, as to "Accountability for Organizational Results," her appraisal stated that plaintiff "did not achieve a Successful rating because she failed to participate and/or provide much needed input in the internal and external review of program process documents," "required considerable routine guidance from her supervisor and colleagues," and "did not address requested edits recommended by reviewers to program process documents."  *Id.* at 238.

12

Third and finally, with respect to "Fiscal Responsibility/Taxpayer Value," the appraisal explained that plaintiff "failed to demonstrate routine proficiency in processing grant award packages consistent with office policy guidance," especially in terms of "the writing of Grant Manager Memoranda (GMM) and generating Redbooks (Award documents) that accurately reflect approved project activities," and "did not demonstrate the level of proficiency one would expect from an experienced program specialist with more than 10 years in OVW." *Id.*

> h)   *Plaintiff's Performance Improvement Plan (Aug. 2019)*

Per DOJ policy, an employee who receives an "Unacceptable" rating must be placed on a Performance Improvement Plan ("PIP") to provide the employee an opportunity to improve before a final decision on how to address her poor performance review is made. Pl.'s SOF ¶ 111. If an employee's performance remains unacceptable after a reasonable opportunity to demonstrate acceptable performance, an agency may remove the employee. *Id.* ¶ 120; *see also* 5 C.F.R. § 432.105(a)(1).

Consistent with this policy, on August 13, 2019, plaintiff was placed on a 60-day PIP, which outlined in detail her performance deficiencies, tracking the criticism in her 2017–2018 final appraisal, and listed precisely the tasks she had to complete to improve across each of the three critical elements. *See* Def.'s 3d App'x at 249–63 (Ex. 49: Pl.'s PIP).

During the PIP period, Johnson kept detailed notes on plaintiff's performance and met weekly with plaintiff to discuss her progress, answer her questions, and address her concerns. Pl.'s SOF ¶ 121. To allow plaintiff an opportunity to finish two tasks required by her PIP, Johnson also extended the PIP period by over three weeks. *Id.* ¶ 122. Although plaintiff concedes that her PIP period was extended, she denies being informed about this extension. *Id.*

### 4.      *Plaintiff's Notice of Proposed Removal*

In November 2019, Johnson proposed plaintiff's removal.  *Id.* ¶ 123.  In an 18-page Notice of Proposed Removal dated November 21, 2019, Johnson described, in detail, the numerous deficiencies in plaintiff's attempts to satisfy each of the tasks required by her PIP.  *See* Def.'s 4th App'x at 34–53 (Ex. 52: Notice of Proposed Removal), ECF No. 27-6.  She ultimately concluded that plaintiff failed to complete seven of the thirteen tasks and thus that plaintiff's "performance remained unacceptable in all three critical elements."  *Id.* at 35.

Plaintiff submitted written and oral replies to her Notice of Proposed Removal.  *See id.* at 67–76 (Ex. 56: Written Reply), 77–89 (Ex. 57: Oral Reply).

### 5.      *Plaintiff's Applications for Disability Benefits and Retirement*

A week after the Notice of Proposed Removal, on November 26, 2019, plaintiff applied to the Social Security Administration for federal disability benefits.  *See* Def.'s Sealed Exs. at 2–5 (Ex. 55: Pl.'s Application for Disability Insurance Benefits), ECF No. 28.  In her application, she attested, under penalty of perjury, that she "became unable to work because of [her] disabling condition on November 25, 2019."  *Id.* at 3.  Plaintiff subsequently, on May 2, 2020, applied for federal disability retirement based on injuries she suffered in 1987, while she was performing military service, and her rating, by the Department of Veterans Affairs in 2017, as 100% disabled.  *See id.* at 6–16 (Ex. 61: Pl.'s Application for Disability Retirement).

### 6.      *Plaintiff's Termination*

Mary Powers, Deputy Director for Policy, Outreach, and Communications, who is white, had no supervisory relationship to plaintiff, and was not involved in the adjudication of plaintiff's 2018 EEO Complaint, was appointed to serve as the deciding official on plaintiff's removal.  Pl.'s SOF ¶ 153; *see also* Def.'s 4th App'x at 92–94 (Ex. 58: Powers Aff.) (explaining

that she has "no relationship" to plaintiff, including "no relation . . . within the organizational structure," and that she was not involved in plaintiff's EEO activity, which occurred before Powers "came to OVW," and knew nothing about the details of the settlement of plaintiff's 2018 EEO Complaint).  After independent review of the Notice of Proposed Removal, plaintiff's written and oral comments, and all the documentary evidence submitted by both parties, Powers issued, on May 25, 2020, the Decision on Removal, a 12-page decision that addressed each of plaintiff's objections and ultimately concurred with Johnson's conclusion that plaintiff had failed to perform seven of the thirteen tasks in her PIP.[13]  *See* Def.'s 4th App'x at 100–12 (Ex. 59: Decision on Removal).  Plaintiff was ordered terminated, effective March 25, 2020.  *Id.* at 102.

### B.    Procedural History

Prior to receiving an "Unacceptable" rating for her 2017–2018 final appraisal, plaintiff claims she did not think that the allegations described above, *see supra* Part I.A.3, were evidence of discrimination or retaliation, repeatedly characterizing them as only "sporadic[]" or "isolated" "small incident[s]," Def.'s 1st App'x at 14, 16, 19 (Ex. 1: Mera Aff.); *see also* Pl.'s SOF ¶¶ 181–82 (admitting that "[p]rior to her unacceptable 2017–18 appraisal, [plaintiff] had never thought that any of the events that had followed her accommodation record's revision reflected any discrimination or retaliation" and "thought that these occurrences were all just 'small incident[s]'").

On September 9, 2019, plaintiff filed an EEO complaint ("2019 EEO Complaint"), alleging that since the settlement of her 2018 EEO Complaint requiring defendant to "correct" her accommodation record, plaintiff has "suffered a series of minor, but hurtful oppressions on

---

[13]     Powers explained that she "cannot adjudicate [plaintiff's] allegations of reprisal for EEO activity" because "[a]s a member of the bargaining unit," plaintiff was "required to follow the procedures set forth in [her] collective bargaining agreement with regard to allegations of discrimination," which procedures were set out at the end of the Decision on Removal.  *See* Def.'s 4th App'x at 101.

the part of [her] management." *See* Def.'s 4th App'x at 130–31 (Ex. 62: 2019 EEO Compl.).[14]

She explains that she did not "conclude[] that [she] was suffering from a pattern of conduct . . . that stemmed directly from [her] having forced [her] superiors to adhere to the terms of the negotiated settlement agreement of [her] prior disability discrimination claim" until receiving her 2017–2018 final appraisal.  *Id.* at 131; *see also id.* at 132 ("In retrospect, I have come to the belief that all the incidents noted above are part of a discriminatory / retaliatory campaign by Ms. Johnson and Ms. Neufville.").  All of plaintiff's claims were accepted for intake, except for a claim based on her attempt to secure a position in the Tribal Unit, which plaintiff had failed to exhaust.  *See id.* at 135–40 (Ex. 63: Acknowledgment & Partial Acceptance of Compl.).

On April 1, 2020, one week after plaintiff's removal, plaintiff filed another EEO complaint ("2020 EEO Complaint"), alleging that her removal was retaliatory and discriminatory.  *See id.* at 141–43 (Ex. 64: 2020 EEO Compl.).[15]  Plaintiff requested a single final agency decision on her two EEO complaints, *id.* at 144–45 (Ex. 65: Pl.'s Email re: EEO Compls.), and commenced this action, on August 4, 2020, having constructively exhausted her administrative remedies, Compl. ¶ 2, ECF No. 1.

In this action, plaintiff complains of disability discrimination (Count I) and retaliation (Count II), under Title VII and the Rehabilitation Act, and brings a "mixed case appeal" (Count III), under the CSRA.  Defendant's motion for summary judgment is now ripe for resolution.

---

[14]     Plaintiff also alleged racial discrimination because Johnson, Neufville, and Lewis "are African Americans, while I am a white Hispanic," Def.'s 4th App'x at 133, but she has since abandoned this claim, *see* Pl.'s Opp'n at 3 n.2.

[15]     Plaintiff also alleged discrimination based on race and national origin, Def.'s 4th App'x at 142, but those claims have been abandoned, *see* Pl.'s Opp'n at 3 n.2.

## II.      LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists 'if the evidence, viewed in a light most favorable to the nonmoving party, could support a reasonable jury's verdict for the nonmoving party.'"  *Figueroa v. Pompeo*, 923 F.3d 1078, 1085 (D.C. Cir. 2019) (quoting *Hairston v. Vance-Cooks*, 773 F.3d 226, 271 (D.C. Cir. 2014)).  The moving party bears the burden to demonstrate the "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts, supported by materials in the record, that would be admissible at trial, and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (nothing that, on summary judgment, the appropriate inquiry is "whether, on the evidence so reviewed, 'a reasonable jury could return a verdict for the nonmoving party'" (quoting *Liberty Lobby*, 477 U.S. at 248)); *see also Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) ("[S]heer hearsay . . . counts for nothing on summary judgment." (citation omitted)); Fed. R. Civ. P. 56(c), (e)(2)–(3).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science."  *Est. of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011).  This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014), and "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 651 (alteration in original accepted and citation

omitted).  Courts "may not make credibility determinations or weigh the evidence," *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 565 (D.C. Cir. 2019) (internal quotation marks and citations omitted), since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (internal quotation marks and citation omitted); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015).

The fact that a plaintiff's testimony is uncorroborated is immaterial for purposes of summary judgment, since "[c]orroboration goes to credibility, a question for the jury, not the district court."  *Robinson v. Pezzat*, 818 F.3d 1, 9 (D.C. Cir. 2016).  Nonetheless, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (internal quotation marks omitted); *accord* Fed. R. Civ. P. 56(e).  If "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (internal quotation marks omitted) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  The Court is required to consider only the materials explicitly cited by the parties but may, on its own accord, consider "other materials in the record."  Fed. R. Civ. P. 56(c)(3).

## III.   DISCUSSION

Both Title VII and the Rehabilitation Act prohibit an employer from discriminating against an individual by reason of certain protected characteristics and from retaliating against an

employee who engaged in protected activity by complaining of employment discrimination.  *See Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (Title VII); *Kersey v. Wash. Metro. Area Transit Auth.*, 586 F.3d 13, 16 (D.C. Cir. 2009) (Rehabilitation Act).  Whereas Title VII prohibits discrimination based on "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a), the Rehabilitation Act prohibits discrimination "solely by reason of [an individual's] disability," 29 U.S.C. § 794(a).

Plaintiff's complaint alleges three counts: (1) race, national origin, and/or disability discrimination (Count I); (2) retaliation (Count II); and (3) a "mixed case appeal" under the CSRA (Count III), *see* Compl. ¶¶ 15–20, without identifying, as to Counts I and II, what specific employment actions are alleged to be discriminatory or retaliatory and whether each alleged action contributes to plaintiff's claims of race, national origin, or disability discrimination, or some combination thereof.  For this reason, defendant addresses most, if not all, of the factual allegations in the Complaint, even those that clearly do not constitute materially adverse employment actions or have no apparent relation to plaintiff's race, national origin, or disability. *See* Def.'s Mem. at 26–44.

Plaintiff's opposition untangles some of this confusion, by withdrawing her claims of race and national original discrimination, leaving only her claims of disability discrimination, retaliation, and a "mixed case appeal."  *See* Pl.'s Opp'n at 3 n.2.  In addition, with respect to her retaliation claim, she clarifies that she does not allege that any of the pre-removal conduct, by itself, constitutes a materially adverse action.  *See id.* at 3 (acknowledging that "some of the hostile treatment . . . did not rise to the level of an adverse action"), 40 ("Plaintiff . . . does not contend that standing alone these incidents are sufficient to satisfy the definition of an adverse action.").  Rather, she contends that only the following employment actions are materially

adverse: (1) the pre-removal conduct, "taken together," which created a "hostile work environment," and (2) her termination. *See id.* at 3. With respect to discrimination, however, she fails to explain the precise contours of her claim, appearing merely to rehash her retaliation claims and, perhaps, reading her opposition most generously, to raise, for the first time, a standalone claim of hostile work environment. *See id.* at 40–41.

Set against this backdrop, plaintiff's disability discrimination, retaliation, and CSRA claims are addressed *seriatim*.

## A.      Retaliation

Whether brought under Title VII or the Rehabilitation Act, retaliation claims based on circumstantial evidence trigger the familiar *McDonnell-Douglas* burden-shifting framework. *See Jones*, 557 F.3d at 677 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *Kersey*, 586 F.3d at 16–17 (same). Under this framework, "a plaintiff must first establish a prima facie case of retaliation by showing (1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." *Jones*, 557 F.3d at 677 (Title VII); *see also Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014) (Rehabilitation Act). Although the plaintiff's burden at the prima facie stage "is not great," a plaintiff must still "establish facts adequate to permit an inference of a retaliatory motive." *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) (quoting *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984)); *see also Chambers v. Burwell*, 824 F.3d 141, 145 (D.C. Cir. 2016) (explaining that causal evidence that is "merely colorable or not significantly probative is insufficient to establish this element of [a] claim at summary judgment").

If the plaintiff establishes a prima facie case, "the burden shifts to the defendant to produce evidence of 'a legitimate, nondiscriminatory or nonretaliatory reason' for its actions." *Kersey*, 586 F.3d at 17 (alterations in original accepted) (quoting *Reeves*, 530 U.S. at 142).  An employer's burden is slight, needing only to "articulate" a legitimate, nonretaliatory reason for its actions, not to "come forward with affirmative evidence showing its action was not" retaliatory.  *Paquin v. Fed. Nat'l Mortg. Ass'n*, 119 F.3d 23, 26, 29 (D.C. Cir. 1997); *see also Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 257–58 (1981) (explaining that "limiting the defendant's evidentiary obligation to a burden of production," *i.e.*, an obligation only to "*articulate*—not prove—a legitimate, nondiscriminatory reason," will not "unduly hinder the plaintiff" (citation omitted)).  "[T]he ultimate burden of persuasion remains always with the plaintiff."  *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007) (citing *Reeves*, 530 U.S. at 143); *see also McDonnell Douglas*, 411 U.S. at 805 (describing an employer's proffered reason as "presumptively valid").

If the defendant adequately articulates a legitimate, nonretaliatory reason for its actions, "the *McDonnell Douglas* framework—with its presumptions and burdens—disappears, and the sole remaining issue is discrimination or retaliation *vel non*."  *Kersey*, 586 F.3d at 17 (alterations in original accepted) (quoting *Reeves*, 530 U.S. at 142–43).  "Thereafter, to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all the evidence that the adverse employment decision was made for a discriminatory or retaliatory reason."  *Id.* (alteration in original accepted and citation omitted).  A plaintiff fails to meet this burden "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination

21

had occurred." *Salazar v. Wash. Metro. Area Transit Auth.*, 401 F.3d 504, 511–12 (D.C. Cir. 2005) (quoting *Reeves*, 530 U.S. at 148).

Plaintiff alleges that, in retaliation for her 2018 EEO Complaint, the settlement of which required defendant to revise plaintiff's accommodation record, thereby embarrassing defendant, defendant engaged in two materially adverse actions: (1) the pre-removal conduct, "taken together," which created a "hostile work environment," and (2) plaintiff's termination.[16]  Each claim is addressed in turn.

### 1.    *Retaliatory Hostile Work Environment*

In this Circuit, "[a] plaintiff may bring a special type of retaliation claim based on a hostile work environment by alleging a series of individual acts that may not be actionable on their own but become actionable due to their cumulative effect." *Menoken v. Dhillon*, 975 F.3d 1, 5–6 (D.C. Cir. 2020) (alteration in original accepted and citation omitted).[17]  The acts in question must be "adequately linked such that they form a coherent hostile environment claim" and "of such severity or pervasiveness as to alter the conditions of employment and create an abusive working environment." *Id.* at 6 (alteration in original accepted and citation omitted). Defendant moves for summary judgment on plaintiff's retaliatory hostile work environment claim on three grounds, arguing that the claim: (1) was not administrative exhausted; and, in any

---

[16]    Statutorily protected activities certainly include filing an EEO complaint and litigating claims of discrimination, *see Forkkio v. Powell*, 306 F.3d 1127, 1131–32 (D.C. Cir. 2002), but, curiously, plaintiff does not point to the filing of her 2018 EEO Complaint as the protected activity.  Thus, the specific conduct alleged to be plaintiff's protected activity is not precisely clear but could be: (1) the settlement of her 2018 EEO Complaint, Pl.'s Opp'n at 35; (2) defendant's revision, at plaintiff's request of her accommodation record, *id.* at 33; or (3) something else entirely, *see, e.g.*, Def.'s 1st App'x at 12 (Ex. 1: Mera Aff.) (contending that defendant retaliated against plaintiff because she "caught them trying to modify the terms of the 2018 mediation agreement" and "didn't go along with the modifications they made to the document").  Whether settling an EEO complaint or causing an employer embarrassment amounts to protected activities are issues that defendant does not dispute and, therefore, the Court assumes, without deciding, that plaintiff engaged in protected activity when she brought and settled her EEO complaint and required defendant to revise her accommodation record.

[17]    The D.C. Circuit has "assume[d], without deciding, that the Rehabilitation Act creates a cause of action for hostile work environment," *Kuraner v. Mineta*, No. 00-cv-5416, 2001 WL 936369, at *1 (D.C. Cir. July 10, 2001), and the same assumption will be made here.

case, fails on the merits because plaintiff has not established that (2) any discriminatory conduct was so severe or pervasive to alter the conditions of her employment, and (3) a causal link connects plaintiff's statutorily protected activity and her allegedly hostile work environment.

### a)   Administrative Exhaustion

At the outset, defendant argues that plaintiff failed to raise her retaliatory hostile work environment claim at the agency level and thus has not administratively exhausted the claim. *See* Def.'s Reply at 2.  Although both Title VII and the Rehabilitation Act "command[] strict adherence" to the requirement that an individual "exhaust administrative remedies before filing suit in federal district court," *Barkley v. U.S. Marshals Serv. ex rel. Hylton*, 766 F.3d 25, 33–34 (D.C. Cir. 2014) (citation omitted) (Rehabilitation Act); *see also Stewart v. Ashcroft*, 352 F.3d 422, 425–26 (D.C. Cir. 2003) (Title VII), a plaintiff is not required "to have invoked a hostile work environment claim by name or to use specific magic words in order to exhaust it," *Jimenez v. Wolf*, No. 19-cv-2055, 2020 WL 13546497, at *5 (D.D.C. Sept. 29, 2020) (citation omitted). Typically, it is sufficient to "offer at least some suggestion of a hostile work environment such as by referring to an ongoing pattern of conduct or describing a workplace pervaded by abuse." *Jiminez*, 2020 WL 13546497, at *5 (alteration in original accepted and citation omitted).  The core inquiry is whether a plaintiff has "described only discrete events in h[er] administrative charge or also patterns of conduct or other characteristics typical of a hostile work environment claim."  *Id.* (citation omitted).

Here, plaintiff's September 2019 EEO Complaint makes no mention of a hostile work environment claim by name but alleges that plaintiff "suffer[ed] from a pattern of conduct on the part of [her] management that stemmed directly from" the resolution of her disability discrimination claim in October 2018.  *See* Def.'s 4th App'x at 131.  This same complaint then

provides a list of these "hurtful oppressions," including the criticisms of her participation at meetings and work hours and the failures to respond to plaintiff's complaints of micro-management.  *Id.*  These allegations of a "pattern" of "discriminatory" "hurtful oppressions" are sufficient for purposes of administratively exhausting plaintiff's hostile work environment claims.[18]

> b)   *Hostile Work Environment*

On the merits, defendant does not dispute that the alleged individual acts are adequately linked such that they form a coherent hostile work environment claim, perhaps because they all involve the same managers, *see, e.g.*, *Jiminez v. McAleenan*, 395 F. Supp. 3d 22, 35 (D.D.C.

---

[18]     Prior to plaintiff's clarification that she intended to bring a retaliatory hostile work environment claim, rather than separate claims of retaliation based on each alleged pre-removal act, defendant argued that plaintiff failed timely to exhaust several of her individual retaliation claims, including those based on Lewis's feedback, plaintiff's 2017–2018 midterm review, Neufville's question about whether plaintiff was on the phone, Johnson's yelling, and the denials of plaintiff's request for transfer.  *See* Def.'s Mem. at 26–27; *see also* Pl.'s Opp'n at 40–42 (arguing that these allegations were administratively exhausted insofar as they support a retaliatory hostile work environment claim, but not disputing that they were not exhausted as individual claims).  Defendant appears to abandon this argument in reply, arguing only that plaintiff "never raised a hostile work environment claim at the agency level." Def.'s Reply at 7.

Despite the fact that the denial of requests for a transfer, the 2017–2018 midterm review and final appraisal, and plaintiff's subsequent placement on a PIP are quintessential "discrete" acts that generally "constitute[] a separate actionable unlawful employment practice," *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002); *see also Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011) ("*Morgan* requires inquiry into whether incidents occurring outside the statutory period are *sufficiently related* to those incidents occurring within the statutory period as to form one continuous hostile work environment."  (quoting *Wheaton v. N. Oakland Med. Ctr.*, 130 F. App'x 773, 787 (6th Cir. 2005))); Def.'s 4th App'x at 131 (Ex. 62: Sept. 2019 EEO Compl.) (alleging that the hostile work environment "culminated" in her 2017–2018 final appraisal, thereby suggesting that her 2017–2018 final appraisal and subsequent placement on a PIP are not part of her hostile work environment claim), defendant does not challenge the unexhausted allegations as inadequately "linked" to the exhausted ones or plaintiff's assertion that all these incidents, considered together, constitute a *single* hostile work environment claim.  In fact, defendant, in addressing the merits of plaintiff's hostile work environment claim, considers plaintiff's allegations of criticism, negative midterm review and final appraisal, denial of transfer requests, and placement on a PIP, thereby implicitly conceding that, if plaintiff had raised a hostile work environment claim at the agency level, "all of the allegations together form one hostile environment claim," such that all the non-exhausted allegations could be incorporated into the "single hostile environment claim."  *Jimenez v. McAleenan*, 395 F. Supp. 3d 22, 34–35 (D.D.C. 2019) (citation omitted); *see also Baird*, 662 F.3d at 1251 ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for purposes of determining liability." (citation omitted)).  While "[a]s a general matter, this jurisdiction frowns on plaintiffs who attempt to bootstrap their alleged discrete acts of retaliation into a broader hostile work environment claim," *Baloch v. Norton*, 517 F. Supp. 2d 345, 364 (D.D.C. 2007) (cataloguing cases), *aff'd* 550 F.3d 1191 (D.C. Cir. 2008), this issue was neither raised nor briefed by the parties.  Consequently, the Court assumes, without deciding, that plaintiff's allegations are "adequately linked" such that they are timely administrative exhausted and can be considered, on the merits, as a single hostile work environment claim.  *See Ala. Power Co. v. Gorsuch*, 672 F.2d 1, 7 n.34 (D.C. Cir. 1982) (cataloguing cases counseling that courts should decline to address arguments not raised by either party).

2019) (concluding that several events "involv[ing] alleged harassment perpetrated by the same manager" were "adequately linked" (citation omitted)), and argues only that the alleged hostility was not sufficiently severe or pervasive.  Assuming, without deciding, that the alleged individual acts are adequately linked and can form a single hostile work environment claim, *see supra* note 18; *see, e.g.*, *Hussain v. Nicholson*, 435 F.3d 359, 366–67 (D.C. Cir. 2006), plaintiff has nonetheless failed to meet the stringent standard for establishing a hostile work environment.

To prevail on a retaliatory hostile work environment claim, plaintiff must show that defendant "subjected [her] to 'discriminatory intimidation, ridicule, and insult' of such 'severity or pervasiveness as to alter the conditions of [her] employment and create an abusive working environment.'" *Hussain*, 435 F.3d at 366 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)).  "When assessing whether the acts were severe and pervasive enough to constitute a hostile work environment, a court considers 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Menoken*, 975 F.3d at 6 (quoting *Harris*, 510 U.S. at 23).  "Severity and pervasiveness are complementary factors and often go hand-in-hand, but a hostile work environment claim could be satisfied with one or the other." *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014) (citation omitted).  Here, plaintiff has not shown either.

Most generously, plaintiff's allegations consist of several denials of plaintiff's transfer requests, criticisms about plaintiff's work product, attendance, and email etiquette, one instance of a supervisor cursing in a meeting, a poor 2017–2018 midterm review, and a poor 2017–2018 final appraisal and subsequent placement on a PIP, which allegations occurred sporadically over a one-year period from September 2018 to November 2019.  *See Baloch v. Kempthorne*, 550

F.3d 1191, 1201 (D.C. Cir. 2008) ("[Plaintiff's] assertion of pervasive and constant abuse is undermined by the sporadic nature of the conflicts.").[19]  "Each event that [plaintiff] identifies as an example of abusive conduct fails to add materially to the alleged aura of hostility." *Brooks*, 748 F.3d at 1276.

For instance, even setting aside that legitimate reasons were offered for the denial of each of plaintiff's transfer requests, these denials are minimally hostile, if at all, in light of the fact that none of the positions to which plaintiff sought transfer offered greater pay, benefits, or promotional opportunities. *See Stewart v. Evans*, 275 F.3d 1126, 1135 (D.C. Cir. 2002) ("[M]inor changes in work-related duties or opportunities do not constitute an actionable injury unless they are accompanied by some other adverse change in the terms, conditions or privileges of employment.").  The alleged criticisms of plaintiff's work product, attendance, and email etiquette were each grounded in office policies and were "job-related constructive criticism, which can prompt an employee to improve her performance." *Baloch*, 550 F.3d at 1199 (citation omitted); *see, e.g.*, *Weng v. Solis*, 960 F. Supp. 2d 239, 250 (D.D.C. 2013) (explaining that "micromanagement and nitpicking" are not materially adverse).  Any complaints plaintiff may have that these office policies were selectively enforced, that the criticisms were false or invalid, or that her supervisors did not do enough to address her concerns about the harshness of these criticisms do not materially contribute to plaintiff's hostile work environment claim. *See, e.g.*, *Brooks*, 748 F.3d at 1276 (explaining that selective enforcement of office policies "does not necessarily indicate conduct giving rise to a hostile work environment claim"); *Bhatti v. Trs. of Bos. Univ.*, 659 F.3d 64, 74 (1st Cir. 2011) (similar); *Baird v. Gotbaum*, 792 F.3d 166, 171 (D.C.

---

[19]     Although the facts section of plaintiff's opposition arguably lists all these allegations as evidence of a hostile work environment, *see* Pl.'s Opp'n at 11–12, the discussion section addresses only plaintiff's 2017–2018 midterm review, 2017–2018 final appraisal, and placement on a PIP, *see id.* at 32–33.  Even the fact section of plaintiff's opposition, however, makes no mention of the Notice of Proposed Removal in the context of a hostile work environment claim. *See id.* at 11–12.

Cir. 2015) ("A retaliatory failure-to-remediate claim is not actionable unless the underlying incident would itself be actionable."); *Stewart*, 275 F.3d at 1136 (explaining that "false accusations without negative employment consequences" are not actionable (citation omitted)).

Plaintiff's poor midterm review and final appraisal, in addition, were "not uniformly negative," "had some legitimate bases," and were more akin to constructive criticism. *Brooks*, 748 F.3d at 1276–77; *see also Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) (explaining that because "[p]erformance evaluations are likely to be interlocutory or mediate decisions having no effect upon employment," "[t]he result of an evaluation is often speculative, making it difficult to remedy"). Indeed, plaintiff was subsequently placed on a PIP that specifically outlined plaintiff's deficiencies and offered concrete steps that plaintiff had to take to improve. *See* Def.'s 3d App'x at 83 (Ex. 23: Neufville Aff.) (explaining that the purpose of a PIP is "to give an opportunity for the employee to achieve an acceptable rating" and "[t]o improve their performance such as they can"); *see also Brooks*, 748 F.3d at 1277 ("[H]er reviews recommended areas of improvement—hardly the stuff of severe or pervasive workplace hostility."); *Baloch*, 550 F.3d at 1201 ("His allegations of insult are undercut by the legitimate reasons and constructive criticism offered in the letters of counseling and reprimand."); *Durant v. D.C. Gov't*, 875 F.3d 685, 700 (D.C. Cir. 2017) (concluding that plaintiff's placement on administrative leave and reprimand letter were "taken not to intimidate, ridicule, or insult" plaintiff, but "to address his deficient work performance," and thus that these actions did not give rise to a hostile work environment (alteration in original accepted)). Plaintiff's poor midterm review and final appraisal did not affect her "position, grade level, salary, or promotion opportunities." *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (citation omitted). That plaintiff previously received good performance reviews and was eventually fired are also

immaterial.  *See, e.g.*, *Oshiver v. Norton*, No. 00-cv-2284, 2005 WL 3454336, at *13 (D.D.C.

Dec. 16, 2005) (explaining that a performance review is not actionable "simply because the

employer later follows through and terminates the employee"); *Ahuruonye v. Dep't of Interior*,

16-cv-1767, 2022 WL 1746656, at *11 (D.D.C. May 31, 2002) (similar); *Warner v. Vance-

Cooks*, 956 F. Supp. 2d 129, 162 (D.D.C. 2013) (explaining that "[e]valuations may change over

time due to a variety of reasons" and thus that "a more negative evaluation compared to a prior

evaluation" is "a reality of the workplace" and "simply not sufficient, standing alone," to

"establish discrimination, retaliation or pretext").

     Finally, one isolated instance of Johnson cursing in a meeting, though perhaps ill-

mannered, is insufficiently severe to tip the scales of plaintiff's hostile work environment claim,

*see Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (explaining that "sporadic use of

abusive language," "offhand comments, and isolated incidents (unless extremely serious) will

not amount to discriminatory changes in the terms and conditions of employment" (citation

omitted)), especially where defendant took prompt remedial action, *see Vance v. Ball State

Univ.*, 570 U.S. 421, 427 (2013).

     "[N]o bright line rule exists for determining when a number of retaliatory actions—none

of which independently constitutes a typical material adverse action—together comprise a

pattern of retaliation: courts must exercise their judgment carefully on a case-by-case basis."

*Baloch v. Norton*, 517 F. Supp. 2d 345, 363 (D.D.C. 2007), *aff'd* 550 F.3d 1191 (D.C. Cir.

2008).  Here, "the [C]ourt cannot discern a collective retaliation claim greater than the sum of its

parts."  *Id.*  Critically, plaintiff herself appears to recognize that her allegations are not severe or

pervasive, describing them, in her 2019 EEO Complaint, as "a series of minor, but hurtful

oppressions," Def.'s 4th App'x at 131, and in her affidavit, as "sporadic[]" or "isolated" "small

incident[s]," Def.'s 1st App'x at 14, 16, 19.  She further admits, in her statement of facts, that "[p]rior to her unacceptable 2017–18 appraisal, [plaintiff] had never thought that any of the events that had followed her accommodation record's revision reflected any discrimination or retaliation" and "thought that these occurrences were all just 'small incident[s].'"  Pl.'s SOF ¶¶ 181–82.  Put differently, plaintiff has failed to show not only that a reasonable person would find the work environment hostile or abusive, but also that she herself subjectively perceived the environment to be hostile or abusive.  *See Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d 232, 237 (D.C. Cir. 2018) ("The work environment must be both objectively and subjectively hostile, meaning that a reasonable person would find it hostile or abusive, and that the victim must subjectively perceive the environment to be abusive." (alteration in original accepted and citation omitted)).

In sum, plaintiff's allegations, considered together, describe the kind of "ordinary tribulations of the workplace" that courts have refused to find actionable.  *See, e.g.*, *Brooks*, 748 F.3d at 1277–78 (finding no hostile work environment based on plaintiff's allegations of selective enforcement of a time and attendance policy, poor performance reviews, outbursts by a coworker and supervisor, and one isolated incident of conflict between plaintiff and her supervisor); *Hussain*, 435 F.3d at 366 (concluding that "no reasonable jury" could find plaintiff's "twelve alleged retaliatory acts," including poor performance evaluations, denial of medical leave and certain privileges, threats of termination, nonselection for certain jobs, and failure to address insubordination by other employees, even taken together, to constitute a retaliatory hostile work environment).[20]  Heeding the Supreme Court's caution that the "standards for

---

[20]     Plaintiff's only response is that "whether harassment was sufficiently severe or pervasive is quintessentially a question of fact," Pl.'s Opp'n at 41 (quoting *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997)), but the next sentence of this decision from which plaintiff selectively quotes rejects this very position, explaining that summary judgment is "clearly appropriate" when plaintiff's claims—"even assuming them all to be true"—fail

judging hostility" must be applied in a "sufficiently demanding" manner "to ensure that Title VII does not become a general civility code," *Faragher*, 524 U.S. at 788 (citation omitted), the Court finds that plaintiff's allegations are insufficiently severe or pervasive to establish a hostile work environment, which is a necessary predicate, as the alleged adverse action, for the success of plaintiff's retaliatory hostile work environment claim.

### c) Pretext

Even if plaintiff had established a hostile work environment, her retaliation claim would fail because she has not shown that defendant's asserted legitimate, nondiscriminatory reasons for the pre-removal actions, which are "presumptively valid," *McDonnell Douglas*, 411 U.S. at 805, are pretext for retaliation.

Defendant has offered a nondiscriminatory reason for each allegation that comprises plaintiff's retaliatory hostile work environment claim.  *See* Def.'s Mem. at 28–37; *see also supra* Section I.A.  The question thus becomes whether plaintiff has produced sufficient evidence for a reasonable jury to find that the employer's stated reason was not the actual reason and that the employer's actions were retaliatory.  *See Baloch*, 550 F.3d at 1200.  Although plaintiff acknowledges that the burden is hers, *see* Pl.'s Opp'n at 35, she makes minimal attempt to satisfy this burden, *see, e.g.*, *id.* at 33 (conceding that her placement on a PIP was part of defendant's "process").  She curiously addresses only her 2017–2018 midterm review and final appraisal, *see id.* at 33, despite her burden to persuade that each of defendant's proffered reasons are pretext for discrimination.[21]  Plaintiff's response is utterly inadequate.

---

to establish a hostile work environment, *Hartsell*, 123 F.3d at 773.  As evident by the plethora of cases cited above, courts routinely dispose of hostile work environment and retaliation claims at the summary judgment stage.

[21]     Accordingly, defendant's proffered nondiscriminatory reasons for plaintiff's other allegations will not be rehashed.  For the avoidance of doubt, although plaintiff's response to defendant's legitimate, nondiscriminatory reasons could be deemed waived, *see CSX Transp., Inc. v. Com. Union Ins., Co.*, 82 F.3d 478, 482–83 (D.C. Cir. 1996) (explaining that when a party fails to respond to the opposing party's argument, or when its response is

Defendant asserts that plaintiff received a poor 2017–2018 midterm review and an "Unacceptable" rating across all three critical elements in her 2017–2018 final appraisals for a simple reason: her performance was unacceptable.  *See* Def.'s Mem. at 5–6, 33–37.  Defendant identifies numerous specific instances of plaintiff's inadequate performance, *see id.* at 5–6, 11–12, which is further supported by documentary evidence.  Plaintiff's 2017–2018 final appraisal, for example, explicitly states what an employee must do to achieve each of the four ratings in each of the three critical elements.  *See* Def.'s 3d App'x at 235–48 (Ex. 48: 2017–2018 Final Appraisal).  It then explains precisely why plaintiff failed to achieve a "Successful" rating in all three categories.  *See supra* Section I.A.3.g.  "[D]issatisfaction with an employee's performance and identifying specific examples of the employee's inadequate performance is a legitimate, non-discriminatory reason for an adverse action."  *Hogan v. Hayden*, 406 F. Supp. 3d 32, 44 (D.D.C. 2019).

Plaintiff offers two responses, which are easily dispatched.  First, she argues that she previously routinely received "Successful" ratings or better, *see* Pl.'s Opp'n at 5, 11, but the law is "well established that a drop in performance rating does not, without more, give rise to an inference of discrimination," *Ramseur v. Perez*, 80 F. Supp. 3d 58, 74 (D.D.C. 2015) (citing *Xuelin Zhuang v. Datacard Corp.*, 414 F.3d 849, 855 (8th Cir. 2005); *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998)).  "[A]bsent 'error too obvious to be unintentional,' [a] court respects [an] employer's 'unfettered discretion' to evaluate employees."  *Carpenter v. Fed. Nat'l Mortg. Ass'n*, 174 F.3d 231, 236 (D.C. Cir. 1999) (quoting *Fischbach v. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)).

---

"somewhat half-hearted," the party has waived the issue), plaintiff is found, instead, to have failed to satisfy her burden to show that defendant's reasons were pretextual.

Second, plaintiff points to the process by which defendant conducted her midterm review and final appraisal and their delayed issuance as evidence of pretext. *See* Pl.'s Opp'n at 33 (arguing that defendant failed to carry out "a number of specific steps" set out by the CBA, delayed the issuance of plaintiff's midterm review by "six months," and delayed the issuance of plaintiff's final appraisal). She, however, offers no reason why failure to adhere precisely to certain procedures or delayed issuance is evidence of retaliation. She does not, for example, contend that that "a delay between the preparation and delivery of performance reviews was abnormal." *Brown v. Brody*, 199 F.3d 446, 460 (D.C. Cir. 1999), *abrogated on other grounds by Chambers v. District of Columbia*, 35 F.4th 870 (D.C. Cir. 2022) (en banc); *see also Brown v. Nat'l Penn Ins. Servs. Grp.*, 614 F. App'x 96, 99 (3d Cir. 2015) (concluding that plaintiff "fail[ed] to establish some causal nexus between her gender and the delay" in her performance evaluation (citation omitted)). Nor could she, given that plaintiff's 2016–2017 final appraisal, which rated plaintiff "Successful" across all three critical elements, was also delayed, despite being issued *before* plaintiff's alleged protected activity. *See* Pl.'s SOF ¶¶ 7, 28–30; *see also* Pl.'s Opp'n at 5 (explaining that plaintiff received "performance-based cash awards" in August 2016 and November 2017), 17 (explaining that Johnson "specifically complimented" plaintiff during her 2016–2017 final appraisal).

Defendant, in addition, offers a legitimate, nondiscriminatory reason for the delay, explaining that Johnson was still debating how to address plaintiff's misuse of her travel card when the 2016–2017 final appraisal was due. *See* Def.'s SOF ¶ 28. Human Resources thus advised Johnson to delay the issuance of plaintiff's 2016–2017 final appraisal to avoid conflating any rating of plaintiff's performance in the final appraisal with any consequence plaintiff would face for the misuse of her travel card. *Id.* Her 2016–2017 final appraisal was delayed by seven

months, and rather than immediately issuing her 2017–2018 midterm review, defendant issued her 2017–2018 midterm review six months after her 2016–2017 final appraisal, and her 2017–2018 final appraisal six months thereafter.  *See* Def.'s Mem. at 36.  Put differently, defendant explains that plaintiff's appraisal cycle was shifted off-cycle by about seven months due to a delay in adjudicating her credit card misuse, which occurred *before* plaintiff's protected activity, and not *because of* the protected activity.

Plaintiff argues that defendant's "explanation makes no sense as it mixes performance with possible misconduct issues," and plaintiff's final appraisal "was required to be based on her *performance*."  Pl.'s Opp'n at 9 n.4.  Yet, this is precisely why defendant decided to delay plaintiff's 2016–2017 final appraisal: Since plaintiff's final appraisal was supposed to be based on plaintiff's performance, defendant wanted to avoid any misconception that a potentially negative review was due to plaintiff's misconduct and not her performance.  *See, e.g.*, Def.'s 3d App'x at 92–93 (Ex. 24: Johnson's Email re: Timing of Final Appraisal) (Johnson asking whether HR has "a preference" as to whether plaintiff's "conduct [or] performance challenges" should be addressed first, in light of Johnson's intent to issue "a 5-day suspension memo" and a "final performance rating" of "unsatisfactory" for the 2016–2017 term).

To be clear, the conclusion above that defendant has met its burden to produce a legitimate, nondiscriminatory reason does not turn on any credibility determinations, which is outside the Court's prerogative.  Rather, this conclusion turns on the employer's low burden at this stage of the *McDonnell-Douglas* framework, which is one of production, not persuasion. The burden remains on plaintiff to prove that a reasonable jury could conclude from all the evidence that the allegedly hostile work environment was retaliatory—a burden plaintiff has made little to no attempt to satisfy, and thus has failed to do so.

## 2.      *Plaintiff's Termination*

Defendant does not dispute that plaintiff's removal is a materially adverse action and argues only that plaintiff has not shown pretext.  As for the legitimate, nondiscriminatory reason for plaintiff's removal, defendant points to plaintiff's PIP listing thirteen specific tasks plaintiff had to achieve, and plaintiff failing to achieve seven of them.  *See* Def.'s Mem. at 16–21; Def.'s Reply at 5–18.

Plaintiff offers two responses, but neither is persuasive.  First, plaintiff relies heavily on temporal proximity. *See* Pl.'s Opp'n at 33–35.  While temporal proximity may be sufficient to meet a plaintiff's burden at the prima facie stage of the *McDonnell-Douglas* framework, "when an employer comes forward with a legitimate, nonretaliatory reason for an employment action, positive evidence beyond mere proximity is required to create a genuine issue of material fact concerning whether the motive for an adverse employment action was retaliatory." *Minter v. District of Columbia*, 809 F.3d 66, 71–72 (D.C. Cir. 2015) (alterations in original accepted and citation omitted).[22]

Even if plaintiff could rely solely on temporal proximity, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) (citation omitted) (cataloguing cases concluding that three-to-four-month period is insufficient for temporal proximity); *see also Taylor*, 571 F.3d at 1322 (finding "an

---

[22] All the cases cited by plaintiff to support the proposition that temporal proximity is sufficient focus on plaintiff's burden at the prima facie stage, as evident from plaintiff's selective quotations from these cases.  *See* Pl.'s Opp'n at 34; *see, e.g.*, *Pardo-Kronemann v. Jackson*, 541 F. Supp. 2d 210, 218 (D.D.C. 2008) (explaining that "where a defendant retaliates at the first opportunity that is presented, a plaintiff will not be foreclosed from making out *a prima facie case* despite a substantial gap in time" (emphasis added) (quoted in Pl.'s Opp'n at 34)), *aff'd in part, rev'd in part*, 601 F.3d 599 (D.C. Cir. 2010).

inference of retaliatory motive based upon the 'mere proximity' in time"—2.5 months between plaintiff's protected activity and the adverse action—"untenable").  Here, over seventeen months elapsed between plaintiff's revised accommodation record and her eventual termination, and plaintiff offers no affirmative evidence of pretext.  *See Woodruff*, 482 F.3d at 530 ("[P]ositive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine.").  She merely repeatedly emphasizes the chronology of facts that led to her termination in an attempt to justify that a seventeen-month delay between her protected conduct and termination is "not remarkable," Pl.'s Opp'n at 33; *see, e.g.*, *id.* at 35, 40, but mere repetition, regardless of how emphatic, does nothing to shorten this seventeen-month period or affirmatively prove that defendant's legitimate, nondiscriminatory reason is mere pretext for discrimination.

Second, plaintiff outlines, in excruciating detail, all of her disagreements with the Decision on Removal and Notice of Proposed Removal, which was incorporated by reference into the Decision of Removal.  *See id.* at 19–30, 36–39; *see also* Def.'s Reply at 7–18 (offering a task-by-task response).  In short, plaintiff argues that her termination must have been retaliatory because she satisfied the requirements set out in the PIP.  This unsupported, conclusory assertion is insufficient to show pretext.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) ("Accepting such conclusory allegations as true . . . would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial.").

"[I]t is axiomatic that a plaintiff cannot establish pretext simply based on her own subjective assessment of her own performance." *Glass v. Lahood*, 786 F. Supp. 2d 189, 217 (D.D.C. 2011) (alteration in original accepted and citation omitted); *see also Walker v. Johnson*,

798 F.3d 1085, 1094 (D.C. Cir. 2015) (explaining that plaintiff's "own personal opinion is inadequate by itself to create an issue for the jury" and rejecting plaintiff's reliance on "her own opinion of her performance to dispute [her employer's] evaluation"); *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) ("[I]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." (citation omitted)); *Ey v. Off. of Chief Admin. Officer of U.S. House of Representatives*, 967 F. Supp. 2d 337, 344 (D.D.C. 2013) ("[T]he plaintiff's own disagreement with his supervisors' view is certainly not sufficient to establish pretext or discrimination."). This is because showing pretext "requires more than simply criticizing the employer's decisionmaking process." *Hairston*, 773 F.3d at 272. "[T]he key question in this context is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." *Id.* at 273 (citation omitted); *see also Forman v. Small*, 271 F.3d 285, 291 (D.C. Cir. 2001) ("[T]he question before the court is limited to whether [plaintiff] produced sufficient evidence of . . . discrimination, not whether he was treated fairly."). The answer here is certainly yes.

Rather than address every single quibble plaintiff has with the Decision on Removal and Notice of Proposed Removal and each of defendant's responses, one example is sufficient to illustrate why plaintiff's objections to the Decision on Removal fall far short of demonstrating that her removal was pretextual. Since one of the criticisms in plaintiff's 2017–2018 final appraisal was that plaintiff failed to generate accurate Redbooks, a type of award document, Def.'s 3d App'x at 237, the second task plaintiff was required to complete as part of her PIP to demonstrate that she satisfied the second critical element of "Accountability for Organizational Results" was "Award Packaging," Def.'s 4th App'x at 42. *See* Def.'s 3d App'x at 30 (Ex. 21: Johnson Aff.) (explaining that the PIP required plaintiff only "to carry out [at] a successful level,

her regularly-assigned tasks" and that "[t]here was nothing above and beyond that the PIP required of her"). Specifically, plaintiff was required to "provide substantive responses to all inquires regarding [her] Redbooks within 2 business days" and was warned that "[f]ailure to respond to two or more inquiries regarding [her] Redbooks within 2 business days" or "with accurate information will result in failure of this task." Def.'s 3d App'x at 256.

The Notice of Proposed Removal explains that plaintiff was responsible for processing thirteen Redbooks, and only one was "approved and processed without any edits or changes." Def.'s 4th App'x at 43. Four Redbooks "were sent back by reviewers, at least one of which contained more than three errors," and eight "were returned between two and five times due to multiple errors and omissions, including inaccuracies in the project description and incorrect address, salutation, special condition, award amount, or award type . . . , all of which are critical pieces of information that must be correct in all award documents." *Id.* "[A]fter sending the Redbook back to [plaintiff] for changes several times," Johnson sometimes "had to make the changes [her]self." *Id.* Plaintiff was further criticized for "fail[ing] to take advantage of the tools provided to assist [her] in submitting accurate Redbooks" despite "the Redbook training provided to all program specialists on or about May 9, 2019," and "failed to proofread [her] work to avoid repeated mistakes and errors." *Id.* Since "most of [plaintiff's] Redbooks contained more than three errors," Johnson concluded that plaintiff failed to complete this task.

In her written comments, plaintiff argued that she, in fact, successfully completed this task because all errors were "merely a difference in style," and "no structured training on this topic was offered" and thus she was "expected to 'sink or swim.'" *Id.* at 74. Powers, upon reviewing the Notice of Proposed Removal, plaintiff's written and oral comments, as well as the documentary evidence, concurred with the Notice of Removal. Specifically, she explained that

"the emails supporting this task" revealed "significant issues in several Redbooks, including issues with budgets, special conditions, and other documents that were caught by the Legal Team and others in the office," which errors were not "stylistic." *Id.* at 105. "The edits suggested by other members of the OVW review team seemed like items that would be straight-forward general items that were missing." *Id.* Powers also addressed plaintiff's response that "there was not enough training and that specialists are expected to 'sink or swim,'" stating: "This contradicts the evidence provided, which shows you, along with all program specialists, were provided Redbook training as recently as on or about May 9, 2019. Furthermore, this was not the first year that you were processing award documents. With almost 20 years of experience, nine of which were under Ms. Johnson, you have been responsible for drafting Redbooks each year as part of the grant cycle. You should have understood what was required and what Ms. Johnson's expectations were." *Id.*

Plaintiff's opposition largely parrots the objections raised in her original written comments to the Notice of Proposed Removal. She focuses on the criticism that she failed to use the "tools provided" to assist her. Although she concedes that OVW offered a plethora of resources on how to complete Redbooks, including "a briefing," "a manual," "program division meetings," "Powerpoint presentations," and "sample[]" Redbooks and that she met with Johnson weekly to review her progress on the PIP and ask questions, she nonetheless argues that these resources were insufficient since "a briefing is very different from a structured training," she never "receive[d] any training" on the "out of date" manual or Powerpoint presentations, "[s]upervisors rarely respond to [staff] questions," and "samples" do not reflect a supervisor's specific "style." Pl.'s Opp'n at 22. She does not address defendant's evidence that training was

offered as recently as May 9, 2019, or defendant's argument that plaintiff, who had almost twenty years of experience, should not be making the basic mistakes found in her work product.

With respect to Johnson's allegation that plaintiff failed to proofread her work, plaintiff "admits she made some minor errors in grammar and failed to include a note in a Grant Management Statement" but contends that all these errors were "stylistic only."  *Id.*  Plaintiff does not address the fundamental problem: that twelve of the thirteen Redbooks were found to be inadequately completed for containing deficiencies that "plainly went far beyond mere stylistic quibbles."  Def.'s Mem. at 38.  She does not address Johnson's criticism that four Redbooks were sent back by reviewers, that eight Redbooks were returned to plaintiff between two to five times due to multiple errors, that Redbooks included inaccuracies to basic but critical information, or that Johnson would sometimes just make the changes herself after multiple rounds of edits still did not fix problems in plaintiff's Redbooks.[23]

In addition, Powers, the individual who ultimately decided to terminate plaintiff, was not aware whether plaintiff's "disabilities have affected her ability to perform her job" and knew little, if anything, about plaintiff's prior requests for reasonable accommodations.  Def.'s 4th App'x at 93–94 (Ex. 58: Powers Aff.).  She was not involved in any way in plaintiff's 2018 EEO Complaint, which was filed and settled before Powers "came to OVW," knew only that plaintiff filed an EEO complaint in 2018 and that "an agreement . . . was reached," and did "not know what the details were of the agreement."  *Id.* at 94.  Powers reviewed the PIP, the Notice of Proposed Removal, plaintiff's written and oral responses, and all the documentary evidence,

---

[23] Plaintiff's contemporaneous application for federal disability benefits, in which she states that she "struggle[s]" to "complet[e] [her] duties," "contribute and retain information," "follow[] some directions involved in finishing a project," only supports defendant's proffered explanation.  *See* Def.'s Sealed Exs. at 11–13; *see also* Def.'s Reply at 18–23; *cf. Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (explaining that a plaintiff "cannot simply ignore [an] apparent contradiction that arises out of" a "previous sworn statement," such as in an application for disability benefits, "without explaining the contradiction or attempting to resolve the disparity").

such as email traffic and previous performance reviews and concluded that plaintiff failed to successfully complete her PIP.  *See id.* at 95–97; *see also id.* at 98 (explaining that Powers decided to terminate plaintiff, in part, because "[t]here was very basic information I was missing in her documents that she would submit and there is just a number of things that did not get raised to the standard that was set," and "there were many instances in which she would continually rely on her supervisor and other members of her team to do her work for her").  Any allegations of retaliation, according to Powers, was "out of the scope of what [she] had been asked to review," which was "her performance based on the performance improvement plan." *Id.* at 97.

To be clear, as before, the conclusion that plaintiff has not met her burden at the third stage of the *McDonnell-Douglas* framework does not turn on credibility determinations or a finding that defendant was correct in concluding that plaintiff failed to satisfy seven of the thirteen tasks in her PIP.  The fundamental problem with plaintiff's arguments is that, even were she correct that Johnson's criticisms were "stylistic" and plaintiff was not afforded any training, she has still offered no evidence that defendant's proffered reason for terminating plaintiff— plaintiff's failure to satisfy the terms of her PIP—which reason is "presumptively valid," *McDonnell Douglas*, 411 U.S. at 805, is pretext for discrimination, *see Robinson v. Red Coats, Inc.*, 31 F. Supp. 3d 201, 215 (D.D.C. 2014) ("It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible, but rather she must show that the explanation given is a phony reason" (alteration in original accepted and citation omitted)).

Courts are without authority to "engage in judicial micromanagement of business practices by second-guessing employers' decisions."  *Kline v. Berry*, 404 F. App'x 505, 506 (D.C. Cir. 2010); *see also McGrath v. Clinton*, 666 F.3d 1377, 1385 (D.C. Cir. 2012) (rejecting

plaintiff's argument that "notwithstanding his failings, the Department should not have terminated him because there were extenuating circumstances and there were some positive attributes to his performance" because "courts are without authority to second-guess an employer's personnel decision absent a demonstrably discriminatory motive" and plaintiff's "responses offer no grounds for a rational juror to conclude that the reason he was fired was retaliation rather than poor performance" (alterations in original accepted and citation omitted)). Accordingly, defendant's motion is granted as to plaintiff's retaliation claims.

### B.     Disability Discrimination

To withstand summary judgment on a claim for disability discrimination under the Rehabilitation Act, which "governs employee claims of [disability] discrimination against the Federal Government," *Ward v. McDonald*, 762 F.3d 24, 28 (D.C. Cir. 2014) (citation omitted), a plaintiff "must produce enough evidence to allow a reasonable jury to conclude that he (1) has a disability; (2) was qualified to perform the essential functions of employment with or without reasonable accommodation; and (3) suffered an adverse employment decision due to his disability," *Desmond v. Mukasey*, 530 F.3d 944, 952 (D.C. Cir. 2008).

At the outset, the precise contours of plaintiff's disability discrimination claim are unclear.  As described in plaintiff's opposition, her discrimination and retaliation claims appear to be identical.  *See* Pl.'s Opp'n at 31–35 (arguing that defendant discriminated against her by "undert[aking] a course that was designed to and did culminate in her termination," in retaliation for the parties' settlement of plaintiff's failure to accommodate claims), 35–40 (arguing that defendant discriminated against her by "terminat[ing] [plaintiff] because of her protected activity").  Summary judgment is granted to defendant on these claims for the reasons explained above.  *See supra* Part III.A.

To the extent plaintiff intends to bring a standalone hostile work environment claim, this claim fails for the same reasons as her retaliatory hostile work environment claim. *See Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 79 (D.D.C. 2013) (collecting cases establishing that "the same legal standard" applies to discriminatory and retaliatory hostile work environment claims").[24]  Any other generic disability discrimination claim also fails, for the fundamental reason that plaintiff offers no evidence to support a finding that any alleged discriminatory actions were taken due to her disability.  She alleges only that her employer knew of her disability, as if this were enough to withstand summary judgment.  *See* Def.'s 4th App'x at 150 (Ex. 66: 2d Mera Aff.) (stating, in response to the question why plaintiff believes her "termination was based on [her] disability," that "Ms. Neuville [sic] and Ms. Johnson are both aware of my extensive disabilities based on medical documentation that was provided to both of them to allow me to have accommodations," and "I believe they used that information against me").  Alleging, and assuming as true, that an employer had knowledge of a plaintiff's disability is utterly insufficient to sustain a plaintiff's burden on summary judgment.  *See Tyes-Williams v. Garland*, No. 17-cv-1191, 2021 WL 4262631, at *4 (D.D.C. Sept. 20, 2021) ("[A] decisionmaker's knowledge of an applicant's race does not suggest—let alone prove—that he discriminated against the applicant."); *see also Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1073 (8th Cir. 1998) ("Mere knowledge of a disability cannot be sufficient to show pretext; otherwise, summary judgment for an employer would be appropriate only in cases where the employer is completely unaware of the plaintiff's disability."); *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 84 (6th Cir. 2020) (similar); *Klimek v. United Steel Workers Loc. 397*, 618 F.

---

[24]    As noted, *see supra* note 17, the Court assumes, without deciding, that the Rehabilitation Act creates a cause of action for hostile work environment.

App'x 77, 80 (3d Cir. 2015) (similar).  Accordingly, defendant is entitled to summary judgment on plaintiff's disability discrimination claim.

## C.    Mixed Case Appeal

The Civil Service Reform Act "establishes a framework for evaluating personnel actions taken against federal employees" through a series of graduated administrative procedures, "depending on an action's severity." *Kloeckner v. Solis*, 568 U.S. 41, 44 (2012).  "As a whole, section 7702 provides a rigid timeline for advancing mixed cases through the various phases of administrative and judicial review set forth therein." *Butler v. West*, 164 F.3d 634, 640 (D.C. Cir. 1999).  For certain claims of discrimination, an employee "has a right to appeal the agency's decision to the [Merit Systems Protection Board ("MSPB")], an independent adjudicator of federal employment disputes." *Kloeckner*, 568 U.S. at 44.  "When an employee complains of a personnel action serious enough to appeal to the MSPB *and* alleges that the action was based on discrimination, she is said (by pertinent regulation) to have brought a 'mixed case.'" *Id.* (citing 29 C.F.R. § 1614.302).

Section 7702(e) provides that, in certain circumstances, "an employee shall be entitled to file a civil action to the same extent and manner as provided" in Title VII.  5 U.S.C. § 7702(e)(1).[25]  This provision, however, "merely provides the mechanism by which [a] plaintiff may bring his underlying claim of discrimination before [a] [c]ourt" and "does not provide a separate cause of action against the defendant." *Kelly v. Barreto*, No. 5-cv-900, 2006 WL 2568443, at *5 (D.D.C. Sept. 5, 2006); *see also Dearman v. Kurtz*, 516 F. Supp. 1255, 1259

---

[25]     Section 7702(e)(1) thus "expressly grant[s]" jurisdiction to federal courts.  *Butler*, 164 F.3d at 641. Defendant cites *American Federation of Government Employees v. Secretary of Air Force*, 716 F.3d 633 (D.C. Cir. 2013), for the proposition that this Court has no jurisdiction over plaintiff's mixed case claim, Def.'s Mem. at 44, but *American Federation* concerns a different provision of the CSRA providing for judicial review of certain orders "in the circuit in which the person resides or transacts business," 716 F.3d at 637 (quoting 5 U.S.C. § 7123(a)). Interpreting this language, the Court concluded that "the exclusive remedial scheme of the CSRA keeps these claims out of the district court entirely" and thus affirmed the district court's dismissal of these claims for lack of subject matter jurisdiction. *Am. Fed'n*, 716 F.3d at 640.

(D.D.C. 1981) (explaining that Section 7702(e) "does not empower the Court to consider . . . claims or causes of action arising under the CSRA"); *cf. Garfield v. Dep't of Health & Hum. Servs.*, No. 99-cv-3208, 2000 WL 27894, at *2 (Fed. Cir. Jan. 12, 2000) (explaining that "Section 7702 includes cases in which an employee alleges a cause of action for religious discrimination," suggesting that Section 7702 requires an underlying discrimination claim). Plaintiff's only effort to defend Count III is to quote the statutory language, with no analysis, *see* Pl.'s Opp'n at 42–43, which defense is woefully inadequate to overcome the long-standing law against the CSRA providing a separate cause of action.  Plaintiff's stand-alone claim under the CSRA thus fails on this ground alone, but, even if the CSRA created a cause of action, independent from a Title VII or Rehabilitation Act claim, plaintiff's CSRA claim, which is duplicative of her retaliation and discrimination claims, would fail on its merits for the reasons explained.  *See supra* Parts III.A–B.

## IV.   CONCLUSION

For the foregoing reasons, even with all the facts and assumed inferences drawn in her favor, plaintiff can neither show that her treatment within her work environment, though not ideal from her perspective, was sufficiently severe or pervasive to alter the terms, conditions, or privileges of her employment, nor satisfy her burden, at the third step of the *McDonnell-Douglas* framework, to illustrate that defendant's legitimate, nondiscriminatory reasons for the acts that allegedly comprise plaintiff's hostile work environment were pretext for discrimination. Plaintiff, in addition, fails to satisfy her burden of persuading that defendant's legitimate, nondiscriminatory reason for her termination—plaintiff's failure to complete seven of the thirteen tasks required by her PIP—is pretext for discrimination.  Her disability discrimination claim, which is largely duplicative of her retaliation claim, fails for the same reasons as her

retaliation claim, as well as because plaintiff offers no evidence to support a finding that any of the alleged discriminatory actions were taken due to her disability.  Since plaintiff's retaliation and discrimination claims fail, so too does her CSRA claim because the CSRA merely provides a mechanism to bring such claims in court, and not an independent cause of action.

Accordingly, defendant's Motion for Summary Judgment, ECF No. 27, is **GRANTED**.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:   March 25, 2024

_____
**BERYL A. HOWELL**
United States District Judge